Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 1073 | **DATE** | 2/1/2001 |
| **CASE TITLE** | Marsha Manheim vs. University of Illinois Board of Trustees, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order. Defendants' motion [12] to dismiss as to Count I is granted and motion to dismiss as to Count II is denied. Defendants are directed to answer Count II of plaintiff's complaint on or before 2/23/01. Status hearing and scheduling conference is set for 2/26/01 at 9:30 a.m. The parties are directed to proceed with compliance with Rule 16 in advance of the conference.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | FEB 0 2 2001 | 23 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | C.S. | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 2/1/2001 | |
| MD | courtroom deputy's initials | OR DOCKETING / 01 FEB -1 PM 4: 01 | date mailed notice | |
| | | Date/time received in central Clerk's Office | MD mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

FEB 0 2 2001

|  |  |  |
|---|---|---|
| MARSHA MANHEIM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00 C 1073 |
| | ) | |
| UNIVERSITY OF ILLINOIS BOARD OF | ) | |
| TRUSTEES et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Marsha Manheim, in her first amended complaint claims deprivation of rights to due process and equal protection in violation of the Civil Rights Act of 1871, as amended, 42 U.S.C. § 1983, in connection with her termination from employment at the University of Illinois at Chicago ("UIC"). Defendants are the University of Illinois Board of Trustees, Gerald Moss ("Moss"), Dean of the College of Medicine, Chancellor David Broski ("Broski"), and President James Stukel ("Stukel"). All defendants have moved to dismiss the complaint for failure to state a claim upon which relief may be granted. For the reasons articulated below, the court grants defendants' motion as to count I and denies defendants' motion as to count II.

## MOTION TO DISMISS STANDARDS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges the sufficiency of the complaint for failure to state a claim upon which relief may be granted. *General Electric Capital Corp.* v. *Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997). Dismissal is appropriate only if it appears beyond a doubt that the plaintiff can prove no facts in support of its claim that would entitle it to relief. *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957);

*Kennedy* v. *Nat'l Juvenile Det. Assoc.*, 187 F.3d 690, 695 (7th Cir. 1999). In ruling on the motion, the court accepts as true all well pleaded facts alleged in the complaint, and it draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson* v. *E.J. Brach Corp.*, 176 F.3d 971, 977 (7th Cir. 1999); *Zemke* v. *City of Chicago*, 100 F.3d 511, 513 (7th Cir. 1996).

## FACTS

Plaintiff's detailed complaint alleges the following facts: In November, 1993, plaintiff began working at UIC as the assistant to the associate dean of student affairs for the medical college, Dr. William Wallace ("Wallace"). From November, 1993 through October, 1994, plaintiff reported directly to Wallace, and Wallace informed plaintiff that although a masters degree was required for plaintiff's position, UIC had waived this prerequisite when it hired her. In October, 1994, Wallace accepted another position at UIC, and senior associate dean L.J. Sandlow ("Sandlow") named plaintiff as acting associate dean of student affairs while UIC searched for a permanent replacement for Wallace. Plaintiff continued to perform her previously assigned duties while performing the additional duties of acting associate dean and, at all times, met Sandlow's expectations for performing both these jobs.

After plaintiff became acting associate dean, she learned that the medical school faculty had been dissatisfied with student promotion policies and curriculum requirements administered, at times on an *ad hoc* basis instead of in conformance with established standards, by the office of student affairs for the medical college. In addition, the faculty and administration, including the Chicago Curriculum Committee, the Chicago Student Advancement Committee, and the College Committee on Student Promotions, proposed more stringent promotion policies and curriculum changes. As a result of the demands of the medical school faculty and administrators for strict

2

adherence to established promotion and curriculum policies, a significant number of minority students were reviewed and terminated from the medical program and some of the affected students filed grievances with UIC.

The UIC medical school hired Louis Binder ("Binder") as associate dean of student affairs by the beginning of the 1995-96 academic year. Although plaintiff adeptly dealt with the medical school faculty-student promotion and curriculum problem previously described, minority student dissent and grievance filing escalated after UIC hired Binder, and Binder became the subject of complaints lodged by minority students who were either reviewed or terminated by the medical school. In discharging her duties as assistant to the associate dean, plaintiff had many discussions with UIC counsel Donna Williamson, who informed her that very few formal charges had been filed but that the situation was problematic because the racial discrimination issue was being exposed to public scrutiny through the media. Although Binder sought to promote plaintiff during this volatile time to the position of assistant dean of student affairs, instead he named her director of student affairs.

On July 6, 1996, Binder wrote a letter to Sandlow proposing that plaintiff's position be reclassified to assistant dean of student affairs and her salary increased. Plaintiff spoke with Sandlow regarding the masters degree requirement for the position of assistant dean, and Sandlow informed plaintiff that the positions of director of student affairs and assistant dean were identical with only a title change. He also told plaintiff that a masters degree was not required and that any desire to pursue such a degree should be for her own self-edification. During the summer of 1997, Binder's request for a waiver of search process regarding plaintiff's reclassified position was approved. Both the proposed reclassification and the waiver stated, as

3

justifications for the proposed actions, that plaintiff should be given a job consistent with her qualifications and responsibilities and noted her exemplary performance record to date.

On March 19, 1998, Binder informed plaintiff that he needed to issue her a terminal contract, which would not be renewed the following year, due to restructuring within the Office of Student Affairs. Plaintiff was shocked by this sudden change of events and contacted the Office of Access and Equity to discuss her rights and deadlines for filing a grievance regarding the terminal contract issuance. The Office of Access and Equity informed plaintiff that if restructuring within the Office of Student Affairs was merely a pretext for her termination she would be denied her due process right to grieve, investigate, or to have a hearing regarding the true grounds for termination. The Office of Access and Equity also informed plaintiff that the deadline to grieve the issuance of the terminal contract was 45 days from the day she received notice of it.

Because plaintiff did not want to neglect many time-sensitive responsibilities at UIC, she drafted a letter to the Chancellor's office asking for an extension of the 45-day grievance deadline. Plaintiff also consulted with Sandlow regarding whether or not to grieve, and "Sandlow offered suggestive remarks indicating to plaintiff that she should listen to and trust him and, further, that he did not perceive that filing a grievance would be in plaintiff's best interest at UIC." (Compl. at ¶ 55.) In late March and April, 1998, plaintiff spoke with Sandlow about alternative employment within UIC and the UIC medical school, and Sandlow indicated that he did not want to lose plaintiff and was committed to helping plaintiff explore employment opportunities within the medical school. Based on Sandlow's and other colleagues' advice, plaintiff drafted but did not file a grievance regarding the issuance of the terminal contract.

Shortly after plaintiff decided not to file a grievance, she had a disagreement with Binder about staffing issues culminating in Binder's threat to immediately terminate plaintiff. Plaintiff spoke to Sandlow about this disagreement, and Sandlow told plaintiff not to worry about the disagreement or the resultant termination threat. Sandlow also informed plaintiff that Binder's contract would not be renewed and would end effective July, 1998. Sandlow additionally advised plaintiff to immediately enroll in a masters degree program.

In May, 1998, Sandlow hired William Hammett ("Hammett") to replace Binder, told plaintiff that her terminal contract would be overturned, and advised her to patiently wait to see what Hammett would do regarding extending her contract. Sandlow was unable to find an appropriate masters program for plaintiff but reviewed the masters programs plaintiff was considering. After counseling plaintiff as to what masters program to enroll in, and ruling out two potential programs, Sandlow indicated that the masters program in Human Services/Counseling at National Louis University would appropriately complement her career in the Office of Student Affairs. Plaintiff enrolled in this masters program.

Hammett replaced Binder as acting associate dean of student affairs on July 1, 1998, and Sandlow encouraged plaintiff to assist Hammett in preparing for his position. Hammett and plaintiff worked well together, and Sandlow appeared pleased with this relationship. In October 1998, plaintiff asked Hammett whether she should pursue other employment opportunities. Hammett responded that he wanted plaintiff to continue her employment with the Office of Student Affairs and that he had informed inquiring staff members, faculty, administrators, and students that he intended to retain plaintiff in her current position. Hammett also indicated to plaintiff that, according to Moss, Sandlow, and vice-dean Charles Rice ("Rice"), Hammett was

5

responsible for staffing the Office of Student Affairs, and that he had incorporated plaintiff into both his short- and long-term management plans submitted to his superiors for approval and that plaintiff should not worry about any paperwork related to her present contract termination or her expected future contract. Hammett told plaintiff that either her terminal contract would be overturned, her old contract extended, or a new contract written, and the specific details would be worked out later. When plaintiff expressed concern about the lack of formal paperwork and her need to pursue other career opportunities, Hammett indicated that the type of formalization he envisioned often occurred after an employee had begun working under an "unformalized" contract. When plaintiff asked Hammett whether she needed to worry, Hammett responded, "Marsha, you're choosing to worry." (Compl. at ¶ 89.)

Plaintiff and Hammett enrolled in a professional development conference scheduled for late April, 1999. The associate dean of finance, Mike Harms ("Harms"), refused to process plaintiff's plane ticket, however, since paperwork indicated that her contract ended on April 19, 1999. Hammett told plaintiff that he would explain to Harms that plaintiff would be given a contract and would be working for UIC at the time of the conference. Plaintiff stated that she would pay for her plane ticket to the conference with her credit card "expecting that she would receive reimbursement when the paperwork became finalized, and Hammett agreed that this would be the most expeditious manner to deal with the issue." (Compl. at ¶ 93.)

In the winter of 1998-99, Hammett assigned plaintiff to work on an "ongoing assignment requiring continuity into the future." (Compl. at ¶ 94.) In addition, plaintiff was included in a meeting on March 30, 1999, with the Convocation Committee called to plan the May, 1999 convocation, resulting in plaintiff being responsible for performing and overseeing planning and

preparation "for which the Office of Student Affairs was responsible up to and through the May 1999 convocation and commencement ceremonies." (Compl. at ¶ 96.) During the course of a conversation with associate dean Lilly Harte ("Harte") regarding the commencement day brunch, Harte gave no indication that plaintiff would not take part in planning the brunch due to her termination, and no deans or other attendees at the meeting indicated that plaintiff's contract would not be renewed in April, 1999.

On April 8, 1999, plaintiff attended a meeting where Hammett named plaintiff as a resource for the Leadership Roundtable group, a new medical student group plaintiff helped develop, when it reconvened in the 1999-2000 academic year. In addition, Hammett encouraged plaintiff throughout March and April, 1999 to redesign her office space and order new furniture "more representative of the leadership role in the office which he intended for her" and told plaintiff that she would be involved in selecting the support staff Hammett planned to hire to assist plaintiff. (Compl. at ¶ 100.) During orientation assemblies in early April, 1999, Hammett referred to plaintiff as a primary and important contact for the 2000 and 2001 student classes, and Hammett and plaintiff regularly met with the office manager to discuss long-term planning. To accommodate Hammett's need for plaintiff's services, plaintiff also refrained from using earned vacation time with the expectation that she would take her vacation during the summer when her office duties were less demanding.

Plaintiff met with Hammett, Sandlow, Moss, and Rice in early April, 1999 to discuss her new or revised contract, after which Hammett reported to plaintiff that he still needed to work out some details. After meeting with Moss on April 8, 1999, however, Hammett informed plaintiff that Moss had some concerns about renewing her contract and that he would submit to

7

Moss a written summary of the reasons he believed UIC should retain plaintiff. Hammett also told plaintiff that he wanted to impress upon Moss that Hammett had relied on his own decision-making authority when he had assured plaintiff months earlier that her contract would be renewed. On April 13, 1999, Moss informed both Hammett and plaintiff that plaintiff's contract would not be renewed, and Hammett and others informed plaintiff that Brodski had made the decision to terminate plaintiff's employment and conveyed that decision to Moss despite Brodski's awareness (through Moss) that Hammett had offered plaintiff a renewed contract. Plaintiff's contract terminated April 19, 1999.

## DISCUSSION

### The Due Process Claim

Plaintiff first contends that she has a property interest in continued employment at UIC which arises from an implied contract based on promissory estoppel, specifically, that she reasonably and justifiably relied to her detriment on Sandlow's and Hammett's representations that her contract would be renewed upon their recommendations. The due process plaintiff claims she was denied consists of the opportunity to grieve the termination under the university's administrative procedures. Defendants argue (1) that plaintiff has not alleged facts that support a property interest protected by the due process clause; (2) that even if she had a property interest, she was not denied due process; and (3) that even if she has stated a prima facie claim, none of the defendants is liable either in an official or individual capacity. The motion can be resolved on the second argument. Plaintiff has failed to allege facts that would, if proved, amount to a denial of due process.

Plaintiff's opportunity to grieve her terminal contract is the only due process to which

plaintiff claims she was entitled. She alleges that she reasonably and justifiably relied on

Sandlow's and Hammett's "assurances that she would receive an extended contract for the

following academic year" and as a result she believed the decision to extend her contract had

replaced the decision to terminate her employment; therefore, she "did not avail herself of the

extended time she sought from the Chancellor to grieve the decision . . . ." (Compl. at ¶ 136.)

Plaintiff also alleges, however, that she drafted a letter to the chancellor asking for extension of

time within which to grieve. Nowhere in the complaint does she allege that she sent the letter or

that the chancellor granted her an extension. The court also notes that plaintiff uses the word

"sought" in paragraph 136, as opposed to "received." Nothing in the complaint, therefore, leads

the court to infer that any extension of time was granted. As such, the time to grieve her terminal

contract expired on May 3, 1998, 45 days after she was notified of the terminal contract (March

19, 1998). Because Hammett did not replace Binder until July 1, 1998, plaintiff could not have

relied on any of Hammett's statements when deciding whether to grieve the terminal contract,

and plaintiff does not allege that Sandlow ever told plaintiff that her contract would be renewed.

Instead, plaintiff alleges that she consulted Sandlow about whether to grieve and that he

discouraged her from doing so. Plaintiff, therefore, was not *denied* the opportunity to grieve but

simply chose not to grieve and instead elected to wait and see what the future would hold.[1]

Count I of the amended complaint will be dismissed.

## The Equal Protection Claim

Plaintiff next contends that the Board, by and through high-ranking UIC officers, including Brodski and Stukel, denied her equal protection when they terminated her because of her race, white, "in an attempt to diffuse and appease an unfounded perception widely propagated by various disgruntled students that Plaintiff, from the time she assumed the transitional role in the Office of Student Affairs through Dean Binder and Dean Hammett's tenures, either contributed to, or directly caused what was wrongly perceived as [racially motivated] unfair review and/or termination [of minority students]." (Compl. at ¶ 149.) Defendants argue that count II is fatally deficient because plaintiff "has not shown she was similarly situated to the unnamed black administrator who replaced an unnamed white administrator as the Associate Dean of Student Affairs." (Mem. in Supp. at 15.) Defendants, however, ask too much of the plaintiff at this stage of the litigation. As the Seventh Circuit explained in *Bennett* v. *Schmidt*,

---

[1]Plaintiff admits this election in paragraph 58 of her complaint where she states, "Although Plaintiff drafted a grievance memorandum, she decided not to file her grievance because of Dean Sandlow's advice and because of subsequent advice from her colleagues that certain changes in the Office appeared to be imminent, that she should be patient, and that she should trust Sandlow's guidance." Moreover, plaintiff's complaint alleges that shortly after she decided not to file a grievance, she had a disagreement with Binder and it was only after this disagreement that she learned of Binder's imminent departure and replacement. Therefore, although plaintiff alleges that "Sandlow reiterated that terminal contracts could be overturned and advised her to remain patient to see what Dean Hammett would elect to do with regard to the extension of her contract," Compl. at ¶ 66, she could not have relied on Hammett's statements when deciding whether or not to file a grievance since she wasn't even informed of Binder's departure until after she had already elected not to file.

153 F.3d 516, 518 (7th Cir. 1998), regarding an improperly dismissed complaint alleging racial discrimination:

> Because racial discrimination in employment is "a claim upon which relief can be granted", this complaint could not be dismissed under Rule 12(b)(6). "I was turned down for a job because of my race" is all a complaint has to say. . . . To the extent the district court required plaintiff to include in the complaint allegations sufficient (if proved) to prevail at trial, the court imposed a requirement of fact-pleading. But as we said of another claim of employment discrimination: "a complaint is not required to allege all, *or any*, of the facts logically entailed by the claim. . . . [A] complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing." *American Nurses' Association* v. *Illinois*, 783 F.2d 716, 727 (7th Cir.1986) (emphasis added).

Holding the complaint up to the light shed by *Bennett*, the court readily concludes that it satisfies Federal Rule of Civil Procedure 8's liberal pleading standard. Plaintiff has alleged that her contract was not renewed because of her race. Whether plaintiff may ultimately prove racial discrimination, either through direct evidence of discrimination or under the burden shifting framework set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973), need not be explored at this time. This court's only concern is whether plaintiff has given defendants notice of the gravamen of her equal protection claim. *See Scott* v. *City of Chicago*, 195 F.3d 950, 951-52 (7th Cir. 1997). The answer is yes. She alleges that the defendant officials chose not to renew her because of her race in an effort to appease minority students who had protested the dismissal of minority students from the medical college. This direct allegation of race as the reason for her discharge states a claim for denial of equal protection.

<u>The Capacity in Which Defendants May Be Sued</u>

Defendants argue that plaintiff has not alleged facts (1) supporting official capacity liability against Moss, Brodski, or Stukel for failing to reappoint plaintiff; and (2) supporting

11

individual capacity liability against any of them based on Hammett's and Sandlow's statements. The question of official capacity concerns whether a governmental body may be liable for the actions of its officers. Or, as it is sometimes stated, "A suit against a state official in his or her official capacity is a suit against the state . . . ." *Power v. Summers*, 226 F.3d 815, 818 (7th Cir. 2000). Thus, when officials are sued in their official capacity, the court must determine whether the official's ". . . edicts or acts may fairly be said to represent official policy" so that the government as an entity is responsible under § 1983. *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978).

Both sides agree that plaintiff's official capacity allegations stand or fall on whether Moss, Brodski, and/or Stukel had final policy-making authority regarding the alleged constitutional violations. *See Duda v. Bd. of Educ.*, 133 F.3d 1054, 1061 (7th Cir. 1998). In *Jett v. Dallas Indep. School Dist.*, the Court ruled that whether a state official speaks with final policymaking authority is a question of state law. 491 U.S. 701, 737 (1989).[2] This court must look to relevant state law, in this case UIC statutes, to determine each defendant's actual function. *See Upadhya v. Langenberg*, 834 F.2d 661, 663 (7th Cir. 1987) (stating that university statutes are "bylaws having the force of administrative rules and hence 'law' in Illinois").[3]

---

[2]Once these officials are identified, it is the jury's function to determine whether the decisions of those officials caused the deprivation of the rights at issue pursuant to government policy. *Id.*

[3]Plaintiff's complaint refers to the UIC statutes and both sides cite the UIC statutes in their moving papers. Because the statutory provisions are central to plaintiff's claims, this court may consider the statutory sections attached to defendants' motion to dismiss. *See Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998); *Wright v. Assoc. Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

The parties point to Section 3 of Article IX states, in pertinent part, as follows:

> a. All appointments, reappointments, and promotions of the academic staff, as defined in Article IX, Section 4a, shall be made by the Board of Trustees on the recommendation of the chancellor concerned and the president.[4]
>
> b. Appointments shall be made solely on the basis of the special fitness of the individual for the work demanded in the position.
> * * *
> d. Recommendations to positions on the academic staff shall ordinarily originate with the department or in groups not organized as departments with the officers in charge of the work concerned and shall be presented to the dean of the college for transmission with the dean's recommendation to the chancellor.

Defendants argue that the Moss, Brodski, and Stukel could not have been vested with final policy-making authority since the UIC statutes expressly vest the Board with such authority. Plaintiff does not disagree that Article IX, § 3 vests the Board with final policy-making authority but argues that the Board merely serves a ministerial function completely contingent on the chancellor's and president's recommendation, which, in turn, is contingent on a department head recommendation. In sum, plaintiff argues that Article IX "delegates the decision-making authority with regard to appointment, reappointment, and promotion of academic staff to the department heads." Resp. at 7. In this instance, it would mean that the Board, having (despite the language of the UIC statutes) in fact delegated its authority to Brodski, Stukel, and Moss, permitted one or all of them to make a final decision for the university which denied plaintiff equal protection of the laws. This court does not foreclose the possibility that this might have occurred. In *Duda*, the Seventh Circuit found that "[n]othing in the School Code allows [that

---

[4]Article IX, § 4a states that "[t]he academic staff which conducts the educational program shall consist of the teaching, research, scientific, counseling, and extension staffs; deans and directors of colleges, schools, institutes, and similar campus units; editors, librarians, and such other members of the staff as are designated by the president and the chancellors."

13

court] to infer that a superintendent or principal has been delegated policymaking authority with respect to personnel decisions," despite the fact that "[t]he Illinois School Code requires the principal to submit personnel recommendations to the superintendent and requires the superintendent to make personnel recommendations to the board." The statutory provision at issue in *Duda* states that the school board has the power "[t]o adopt and enforce all necessary rules for the management and government of the public schools of their district" without further qualifying language. 105 ILCS 5/10-20.5. In contrast, the statutory provision at issue here, § 3a, states that Board decisions shall be made "*on the recommendation of the chancellor concerned and the president,*" language from which the court can infer potential delegation. For motion to dismiss purposes, plaintiff has alleged enough facts to support her official-capacity claims against Brodski, whom she alleges was the person who made the final decision. The court does not infer from the UIC statutes the possibility that a dean, however, had final decision making authority, particularly where the complaint alleges that the Brodski had it. As to Stukel, the facts on which plaintiff rests do not support the theory that Stukel made a final decision.

In any event, each of the individual defendants may be sued in his individual capacity as a person who caused the deprivation of plaintiff's right to equal protection because none is protected by the doctrine of qualified immunity. *See Harlow* v. *Fitzgerald,* 457 U.S. 800, 818 (holding that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known") A reasonable person in defendants' positions would have known that the Constitution prohibits racial discrimination in a decision not to renew plaintiff's employment contract.

14

## CONCLUSION

For the above-stated reasons, the court grants defendants' motion to dismiss as to count I and denies the motion as to count II. Defendants are directed to answer count II of plaintiff's complaint on or before February 23, 2001. A scheduling conference in this matter will be held on February 26, 2001 at 9:30 a.m. The parties are directed to proceed with compliance with Rule 16 in advance of the conference.

Enter: _____

JOAN HUMPHREY LEFKOW
United States District Judge

Date: February 1, 2001